Williams Bar Dredging Company, a California corporation, v. Commissioner.
Williams Bar Dredging Co. v. Commissioner
Docket Nos. 3284, 4074.
United States Tax Court
1945 Tax Ct. Memo LEXIS 124; 4 T.C.M. (CCH) 737; T.C.M. (RIA) 45244; June 30, 1945
*124 Petitioner entered into two lease agreements for placer mining on the Yuba River, California. In both, the lessors reserved reversionary and other rights of ownership. Royalties paid to lessors were based on a percentage of net profits in one lease and on a percentage of mint or smelter returns in the other. Held, royalties so paid were includible in the lessors' gross income and hence, excludable from petitioner's gross income. Philip S. Mathews, Esq., 111 Sutter St., San Francisco, Calif., for the petitioner. T. M. Mather, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the petitioner's tax as follows Tax
Year
Deficiency
Income
1939
$ 2,021.29
Income
1940
4,110.07
Income
1941
19,938.15
Declared value excess profits
1941
3,153.34
The sole issue is whether certain amounts paid by the petitioner, pursuant to gold mining agreements, were capital expenditures or were excludibel from the petitioner's income. If not excludible, were they deductible as rents or royalties or as ordinary and necessary business expenses? Findings of Fact The facts were stipulated. *125 The portions thereof material to the issue are as follows: The petitioner is a California corporation with its principal office at San Francisco. It filed its income tax returns for the taxable years with the collector of internal revenue for the first district of California. In the latter part of 1935 and early in 1936 certain individuals entered into a joint venture called the "Mammoth Gold Venture" vor the purpose of obtaining placer mining leases upon, and prospecting for gold in, certain gravel deposits in the bed of the Yuba River in Yuba County, California. During this period three leases were obtained covering a continuous stretch of gravel deposits in the bed of the Yuba River for a distance of upwards of two miles along its course. The first lease was dated January 14, 1936, and was executed by A. Gunning, et al., as lessors, to Elliott E. Check, as lessee, leasing about 247 acres of land for 15 years, or until sooner terminated, pursuant to the conditions set forth in the lease. The lessee was granted the exclusive right of possession for the purpose of mining, exploiting and removing therefrom placer gold or other minerals, with the right to construct buildings and *126 other necessary equipment. A rental of $100 per month was provided until mining operations should begin. The lessee agreed to pay the lessors 10 per cent of all moneys paid by the purchasers of the gold "as and for royalty payments under this lease." The second lease was dated August 5, 1935, and was executed by Mammoth Gold Dredging Company to Milton and Van Wyck, leasing about 160 acres of land for 15 years for mining purposes. A rental of $200 per month was imposed until the mining operations should begin. The purchaser of the gold and other minerals mind from the property was to pay the proceeds thereof to a bank, which, in turn, was instructed to pay 10 per cent thereof to the lessors and 90 per cent to the lessees. Such payments were termed royalties. The third lease was dated January 24, 1936, and was executed by Hazel and Edwin Forbes to Milton, et al., leasing certain fractional lots in the bed of the Yuba River, beginning August 1, 1936, and continuing until all gold and other metals profitably recoverable should have been mined. Certain time limits were set for starting operations and a monthly rental of $250 was payable until such operations should be begun. Thereafter *127 the lessees agreed to pay the lessors 10 per cent of mint or smelter returns as "royalty rental payments" with appropriate adjustments for the rental payments of $250 paid during the period prior to active operation. In all three leases detailed provisions were made for re-entry and forfeiture upon default. The portion of the bed of the Yuba River covered by these leases is hereinafter sometimes designated as the "Mammoth property" and the leases themselves are sometimes designated as the "underlying leases." The lessees named in the underlying leases were nominees of and held the leases for the benefit of Mammoth Gold Venture. As the leases were obtained the Mammoth Gold Venture prospected the property for placer mining purposes. This was accomplished by drilling holes or shafts at appropriate intervals to the depth of the gravel deposit so that the deposit might be thoroughly tested for the presence of gold or other precious minerals in the various strata therein. By drilling such holes at given points on these deposits and keeping records of the findings it was estimated upon the completion of the exploratory work that approximately $1,500,000 gold was recoverable from the *128 area tested, and it was further estimated that this gold could be recovered by dredging operations through the expenditure of $600,000. In June, 1936, with the exploratory work completed, titles checked, and the venture ready for operations, the Mammoth Venture had expended $18,550. A small part was paid for attorneys' fees, rental payments on the leases and miscellaneous expenses. The remainder was expended in the actual drilling and testing operations. At that time it was estimated that $200,000 in capital would be required to build a dredge and to supply the necessary working capital for the actual placer mining operation. The members of Mammoth Gold Venture did not have sufficient capital to finance the dredging operations and it was necessary to interest outside capital for this purpose. Thereupon, the petitioner, Williams Bar Dredging Company, was incorporated under the laws of the State of California on June 18, 1936, and it sold 200,000 shares of its capital stock of the par value of $1.00 per share without any discount or selling commission. Eleven members of the Mammoth Gold Venture subscribed for the petitioner's shares in the amount of $93,500. Twenty-eight other persons, *129 who were not members of the Mammoth Venture, subscribed for the petitioner's shares in the amount of $106,500. The persons constituting the so-called Mamoth Gold Venture entered into an agreement with the petitioner dated July 6, 1936. The agreement is entitled "Agreement of Assignment." The petitioner is designated as the "lessee" and the individuals as the "lessors." The agreement recited that the lessors had acquired certain leases of land on the Yuba River and described the three leases hereinbefore mentioned. The lessors then sold, assigned, transferred, set over and granted to the petitioner as lessee, all of their right, title and interest in the leases and all their rights, powers and privileges thereunder, subject to certain specified conditions and covenants. Article I set forth the covenants of the lessors. They agreed to execute proper instruments of transfer; to pay all royalties to date; to procure extensions of the primary leases if possible; to endeavor to secure a lease or a claim which conflicted with the Gunning lease, and to secure leases on adjacent property and to transfer them to the lessee, such property to become subject to the terms of their present lease. *130 Article II specified the petitioner's covenants. It promised to sell sufficient capital stock to finance the dredging operations. Paragraph 5 provides as follows: "The net profits of the Lessee before depreciation, depletion and Federal income taxes, as said net profits are hereinafter defined, from the operations of the Lessee upon the lands subject to this agreement shall be paid and applied in manner following to wit: "(a) Nothing shall become due to the Lessors hereunder until such net profits before depreciation, depletion, and Federal income taxes, shall equal the aggregate of the par value of all Lessee's shares of stock which shall be issued and outstanding upon the effective date of this agreement (but not exceeding in the aggregate the sum of $200,000), nor until there shall have been paid to the stockholders of Lessee all such net profits, less any Federal income taxes which may have become due prior to payment of all such net profits. "(b) Thereafter the Lessee shall pay as royalty to the Lessors 45% of all said net profits before depreciation, depletion and Federal income taxes, provided, however, that the Lessee shall simultaneously pay to its stockholders as *131 dividends or shall disburse to its stockholders from the amount of depreciation and percentage depletion thereafter accruing, an amount before Federal income tax not less than the royalty so paid to the Lessors. The first $18,550 of such royalty shall be paid to those of the Lessors whose names, addresses and respective interests are set forth in Exhibit D attached hereto and made part hereof. The remainder of such royalty shall be paid to those of the Lessors whose names, addresses, and respective interests are set forth in Exhibit E attached hereto and made part hereof. In the event the Lessee shall sustain a net loss from operations, before depreciation, depletion, and Federal income taxes, for any calendar month during the term of this agreement, such loss shall be carried forward to the month succeeding and the Lessors' royalty shall throughout the term hereof be determined as hereinabove provided upon the net profits of the Lessee before depreciation, depletion, and Federal income taxes, for each calendar month after the Lessee shall first have made good any such net loss for the month or months preceding. "The term 'net profits before drepreciation, depletion, and Federal *132 income taxes' shall mean the gross receipts from the operations, plus return of working capital at the end of the operations; plus any salvage value for the dredge and equipment, less operating costs and royalties to be paid to original lessors named in the leases hereinabove described." The petitioner also agreed to make all leases it might acquire, on adjacent placer ground, subject to the agreement. The lessee was prohibited from assigning the leases of any interest threin or subletting the property, without the consent of the lessors. The agreement further provided that if the petitioner should default in the performance of the terms of the lease or in the payment of royalties, the lessors might terminate the agreement and repossess the property. Specific notices relating to default were required to be given. The petitioner might abandon one or more of the leases if no profitable recovery could be obtained therefrom. The petitioner entered into the possession of the premises demised in the underlying leases, constructed a dredge thereon of the character and within the time stipulated in said underlying leases and in the agreement with its lessors. The petitioner dredged the *133 leased property diligently, as required, and paid to the lessors named in the underlying leases the rents and royalties reserved to them. The petitioner paid to Mammoth Gold Venture, as provided in the agreement of July 6, 1936, $17,238.92 in 1939; $46,657.12 in 1940 and $38,171.25 in 1941. The petitioner's sole rights in the Mammoth property were those granted and defined in the agreement of July 6, 1936, and the petitioner never acquired any title or equity to the property other than as provided therein. After completing the mining of the Mammoth property, as hereinabove described, the petitioner extended its operations on the Yuba River to property owned by Yuba Consolidated Gold Fields, a corporation, hereinafter called Yuba, and contiguous dowristream to the Mammouth property. The petitioner and Yuba entered into an agreement dated September 1, 1941. The document was headed "MINING LEASE" and designated Yuba as the "lessor" and the petitioner as the "lessee." The lease recited that the petitioner was engaged in placer mining operations along the Yuba River and that the Yuba land being leased was situated immediately downstream therefrom. The lease stated that the lessor "does *134 hereby lease, demise and let unto the Lessee, and the Lessee does hereby hire and take of and from the Lessor * * * all of the Lessor's right, title and interest in and to the minerals and the right to mine the same in the * * * property in and along the Yuba River * * *." The lessor leased only its right, title and interest in and to the property "without any covenant or warranty." The petitioner was granted the exclusive right of possession of the property for the purpose of prospecting for, mining, exploiting and removing therefrom the placer gold or other minerals therein. The term of the lease was to continue as long as placer mining operations could be carried on profitably. The lessee might abandon its operations and terminate the lease at any time by delivering to the lessor a quitclaim deed and by paying $10. In any event, the lease was to terminate on December 31, 1947. The lease further provided: "As royalty the Lessee shall pay to the Lessor sums to be determined as follows: (1) Lessee shall keep full, true and accurate records of the yardage worked by it in each period between clean-ups, such yardage to be computed in accordance with a method mutually agreed upon. *135 "(2) From the aggregate net mint and/or smelter returns of all values recovered by Lessee during each calendar month from the demised premises, there shall be deducted and retained by the Lessee a sum equal to five cents for each cubic yard of material worked by Lessee in such month. One-half of any balance remaining shall be paid to the Lessor on or before the 15th of the succeeding calendar month, and the other one-half shall be retained by the Lessee. * * * * *
"(4) The Lessee further shall pay prior to delinquency the taxes levied upon the demised premises by the County of Yuba and charge the Lessor with one-half of the amount so paid. Taxes for the fiscal year 1941-1942 shall be prorated from the date Lessee shall commence operations hereunder and for the fiscal year in which this lease shall terminate shall be prorated to the date of termination." The petitioner was required to notify the public that the lessor was not responsible for the work or materials furnished on the leased property. Upon default by the lessee and due notice thereof, the lessor might terminate the lease and the lessee might remove its equipment from the property within six months thereafter. *136 After the execution of the agreement of September 1, 1941, the petitioner commenced the placer mining of the property covered by the agreement with Yuba and in 1941 paid to Yuba the sum of $26,290.10 under and pursuant to the terms of the agreement. In 1941 the petitioner paid to the Mammoth Gold Venture the sum of $12,960.55 under and pursuant to the provisions of the agreement of July 6, 1936, for and in connection with the operations conducted by the petitioner in that calendar year on the property which was the subject of the agreement with Yuba and not upon the Mammoth property. The sums paid, as hereinabove stated, by the petitioner to Mammoth Gold Venture were paid pursuant to the terms of the agreement of July 6, 1936, and the sums paid by petitioner to Yuba were paid pursuant to the agreement of September 1, 1941. The petitioner did not pay any other or further sums to Mammoth Gold Venture or to Yuba. In its income tax return for the calendar year 1939, the petitioner deducted from its gross income the sum of $17,238.92 which the petitioner in that year had paid to Mammoth Gold Venture. In his notice of deficiency in Docket No. 3284, the Commissioner disallowed such deduction. *137 As such disallowance increased net income in the same amount, the Commissioner increased percentage depletion to the extent of 50 per cent thereof, and the resulting increase in net income, as shown in the notice of deficiency, was $8,619.46. In its income tax return for the calendar year 1940, the petitioner deducted from its gross income the sum of $46,657.12, which the petitioner in that year had paid to Mammoth Gold Venture in respect of operations on its Mammoth property. In his notice of deficiency in Docket No. 3284, the Commissioner disallowed that deduction. As such disallowance increased net income in the same amount, the Commissioner increased percentage depletion to the extent of 50 per cent thereof, and the resulting increase in net income was $23,328.56. In its income tax return for the calendar year 1941, the petitioner deducted from gross income the following amounts: The sum of $38,171.25 paid to Mammoth Gold Venture, resulting from operations on its Mammoth property; The sum of $26,290.10 paid to Yuba; The sum of $12,960.55 paid to Mammoth Gold Venture, resulting from operations on that property which was the subject of the agreement with Yuba. The total *138 of the amounts so deducted was $77,421.90. In his notice of deficiency in Docket No. 4074, the Commissioner disallowed the deductions. As the disallowance of such deductions and the disallowance of a further deduction in the sum of $303.03 (not in controversy) increased net income, the Commissioner increased allowable percentage depletion. The resulting increase in percentage depletion was the sum of $15,795.53, and the resulting increase in taxable net income was $61,929.40. Opinion VAN FOSSAN, Judge: The question before us is a simple one. Were the amounts paid by the petitioner, pursuant to the provisions of its agreements with Mammoth and Yuba, capital expenditures or were they excludible from the petitioner's gross income? The further point is raised that they may have been deductible from the petitioner's gross income either as rents or royalties or as ordinary and necessary business expenses. The answer to the question is found in the agreements themselves. We will first discuss the agreement of July 6, 1936, between the petitioner and Mammoth. A careful analysis of that instrument shows clearly that it is essentially a lease. Throughout the parties are characterized as *139 lessors and lessee and their rights, privileges and prescribed conduct are wholly consistent with that relationship. It is unnecessary to state the features of this instrument which are peculiar to a lease. By reason of their reservation of reversionary and other rights, the lessors retained an economic interest in the minerals in place. The "rovalties" it received upon their removal, therefore, constituted income of the lessors and hence were excludible from the income of the petitioner lessee. In Commissioner v. Felix Oil Company, 144 Fed. (2d) 276, and Commissioner v. Anna Vickers Crawford, 148 Fed. (2d) 776, cases from the Ninth Circuit (in which the case at bar arises), the royalties were measured by a percentage of the net profits. So they are here. Consequently on the authority of these decisions we hold that the amounts of rovalties paid by the petitioner in the taxable years, as heretofore set forth, are not includible in the petitioner's income. The agreement between the petitioner and Yuba likewise exhibits the earmarks of a lease. In it, the lessor, the owner of the property, retained certain rights of forfeiture and re-entry and other reversionary *140 rights which manifestly spell out an economic interest. Counsel for the respondent states. "if under the agreements here in question, the lessors retained an economic interest in the property, the amounts paid are deductible." The measure used to determine the royalties payable in the Yuba case was the aggregate net mint or smelter returns of all values recovered. We see no material difference between that "yard stick" and the net profits basis. In each the lessor and lessee adopted a method convenient for ascertaining the amount of royalties to be paid. The vital factor in problems of this kind is whether or not the relationship of lessor and lessee is established by the mining agreement and thus an economic interest is retained by the lessor. In both leases we have found that such an interest was retained and therefore we conclude that the royalties paid in the taxable years were not includible in the petitioner's gross income for those respective years. The case of Quintana Petroleum Co., 44 B.T.A. 624, affirmed, 143 Fed. (2d) 588, on which respondent relies, involved an assignment and not a sublease and is, therefore, distinguishable. In view of this *141 determination it is unnecessary to discuss the deductibility of these payments either as "rents and royalties" or as ordinary and necessary business expenses. Decisions will be entered under Rule 50.